UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT M. PERRY,                    )
                                    )
                Plaintiff,          )   CIVIL ACTION NO.
                                    )   10-11004-DPW
v.                                  )
                                    )
MICHAEL J. ASTRUE, Commissioner     )
Social Security Administration      )
                                    )
                Defendant.          )


MEMORANDUM AND ORDER
February 27, 2012

Robert M. Perry appeals the final decision of the

Commissioner of Social Security (the "Commissioner") denying his

claim for Supplemental Security Income ("SSI").  After

consideration of the record before me, which I find provides

substantial evidence for the denial, I will affirm the

Commissioner's decision.

**I.  BACKGROUND**

*A.  Medical History*

1.  Medical Records

In June, 2001, at age forty two, Perry was examined by Dr.

Vincent Iacono of  Orthopedic Care Specialists.  Perry reported

that he had been in a severe motor vehicle accident in August,

1998, and that he had been unable to work since.  He stated that

he had pain in the neck and back, and that his pain increased

with changes in the weather or with prolonged sitting or standing

activities.  He stated that his pain was better when he took Percocet, which he did 4-6 times a day.  Dr. Iacono noted that "[t]here is tenderness bilateral parathoracic and paracervical regions" and that "[s]trength throughout is grossly 4 to 4+ out of 5."  X-rays showed "degenerative changes throughout," including "mild changes at 5-6 primarily," "degenerative changes at L2-3," and "mild degenerative changes of the lower thoracic spine."

In November, 2005, Perry was examined at the Caritas Good Samaritan Medical Practice.  Dr. Karen Allard noted that he was suffering from back pain and that he found his neck pain to be even worse than his back pain.  She also wrote that he had hypertension and hepatitis C.  In December, 2005, she wrote that his neck pain was getting worse, with a radiation to the arm. She wrote that he had neck and back pain and hypertension.  Later that month, she noted that he reported that he was having a "bad month" for pain and that he was in "obvious pain."  In March, 2006, Dr. Allard again wrote that Perry suffered from chronic neck and back pain, hypertension, and hepatitis C.

In April, 2006, Dr. Allard wrote that Perry had back pain, neck pain and hypertension.  She noted that he had restarted work, and was doing pricing roof work instead of "actual" roofing work.  She noted that he complained of insomnia.  In May, 2006, she noted that Perry had felt increased back pain that month from

working.  In June, 2006, Dr. Allard again noted that Perry's back pain was increasing "now that he is working" and that he was having "a lot of spasm."  She also wrote that he suffered from back pain, hypertension, and GERD.

In August, 2006, an ultrasound of Perry's left calf showed swelling of the left gastrocnemius muscle.  Dr. Yevgeniy Arshanskiy completed a diagnostic imaging interpretation form and noted that "[n]o cystic or solid mass is identified in the area of swelling" and that "[i]f there is concern for muscle injury or occult infectious neoplastic process follow up with MRI might be helpful."  Dr. Arshanskiy analyzed an MRI taken in September, 2006, and found a "longitudinal tear of the posterior horn of the medical meniscus which extends to the inferior articular surface," a "radial tear of the lateral meniscus seen at the junction of the anterior horn and body," and "no evidence of abnormal signal or mass . . . within the medial lateral heads of the gastrocnemius muscle."

In November, 2006, Perry was seen by Robert G. Carey, LICSW, on referral from prison staff.  Carey noted that Perry reported having been told earlier that day that his father was dying.  Perry also reported that he had difficulty sleeping and had not slept for three nights.  Carey observed that the claimant presented "with somewhat depressed mood and affect (appropriate

to circumstance)" but "with no apparent symptoms of mania or psychosis."

In early May, 2007, an x-ray of Perry's right shoulder revealed "degenerative changes" and "a small linear density at the clavicle tip, which could be a small chip fracture." 230. Dr. Mark Sateriale concluded that Perry had "[o]steoarthritis at the acromioclavicular joint with possible small chip fracture of the distal clavicle."

In mid-May, Dr. Adriana Carrillo of the Lemuel Shattuck Hospital examined Perry to evaluate his right shoulder pain. She noted:

> On exam he is a very well-developed male in no acute distress and the shoulder musculature is noted be very with muscular [sic]. He has full range of motion in both shoulders but it is quite obvious he is in significant pain in the right shoulder. Palpation over the shoulder joint is quite painful in the superior and posterior joint area.

She stated that the x-ray showed "significant AC joint osteoarthritis," that she discussed this with Perry, and that she administered a cortisone shot. She also noted that Perry's "past medical history is significant for GERD and hypertension." In a diagnostic imaging interpretation form completed the next day, Dr. Joseph Polak noted that "[t]here is slight irregularity in the contour of the superior aspect of the clavicle abutting the AC joint" and that "[t]his may represent evidence of early degenerative change" but "[i]t could also be post traumatic."

In late May, 2007, Dr. Carrillo saw Perry at a follow up
appointment.  Perry reported that the injection did not help
much, that he still had pain going up and down his shoulder and
in the anterior part of his shoulder, and that he could not do
external rotation.  Dr. Carrillo noted:

> On physical examination, patient does have pain to palpation
> over the anterior part of the shoulder and the AC joint.  He
> has decreased range of motion especially in abduction and
> anterior flexion and he is not able to do any external
> rotation.

She and Perry discussed treatment options, including injections
and surgery, and she administered another cortisone injection.
Dr. Carrillo noted that Perry "felt instant relief" and "was able
to do all the movements with no pain."

In July, 2007, Dr. Carrillo saw Perry at a follow up
appointment.  Perry reported that his left shoulder was also
giving him problems.  Dr. Carrillo noted that "[e]xamination of
the right shoulder revealed that he has still [sic] pain over the
acromioclavicular joint and positive signs of impingement" and
that "[e]xamination of the left shoulder revealed decreased range
of motion, especially in the last degrees of abduction and
anterior flexion."  Dr. Carrillo further stated that Perry had
"positive rotator cuff tendinitis signs."  Carrillo administered
a cortisone injection in Perry's left shoulder and noted that
Perry "did well and felt instant relief."  She also noted that
she told Perry that he had an impingement syndrome in the right

shoulder, that it was not getting better with treatment, and that she recommended surgery.  Perry responded that the shoulder bothered him so much that he did want to have the surgery.

In July, 2007, Dr. Stephen Bolio of the Norfolk County Sheriff's Office completed a physical assessment noting that Perry had both hypertension and hepatitis.

In August, 2007, after his release from prison, Perry was examined by Dr. Allard.  Dr. Allard completed an updated "Problem List," including back and neck pain, GERD, hypertension, and hepatitis C.  Elsewhere in her notes, she assessed that Perry suffered from hypertension, GERD, chronic neck plain, and depression.  She noted that he was uncomfortable with prolonged sitting.  She also wrote that Perry felt "it would be helpful to restart Prozac" and that Perry was "very upset that his father died while he was in jail."

In September, 2007, Dr. Allard noted that she would increase his Ultram dosage to "take[] the edge off."  She noted that he suffered from hypertension, hepatitis C, GERD, back and neck pain, and depression.  In October, 2007, she noted that the Ultram was helping some, that Perry's knee was "very bothersome," and that he had started on Prozac which was helping with the depression.  In December, 2007, she noted that Perry wanted to delay his shoulder surgery because he had just started working as

a roofing supervisor a couple of times a week.  She noted that he experienced increased pain the day after working.

In January, 2008, Perry was examined at Beth Israel Deaconess Medical Center, where his hepatitis C infection had previously been evaluated three years earlier.  Dr. Richard Doyle noted that Perry "complain[ed] of tiredness and some mild arthralgias," but that "[h]is weight has been stable, and while incarcerated he was working out and appears to be in good physical condition."  Dr. Doyle stated that Perry was "a well-developed, well-nourished male in no acute distress."  He did note that Perry had "continued rise in his total hepatitis C viral load" and recommended further evaluation in the Liver Study Unit, liver biopsy, and imaging.

In February, 2008, Dr. Allard noted that Perry had a cortisone shot in his left elbow, and that his neck pain had been very bad.  Also in February, Perry was also examined by Dr. Raymond Pavlovich of Orthopedic Care Specialists.  Dr. Pavlovich reported that there was no evidence of a fracture in Perry's left elbow and that the joint spaces were "fairly well maintained."

In March, 2008, an MRI of Perry's spine showed "slight interval progression of degenerative disc disease at C5-C6, with progressive disc protrusion and moderate central spinal canal stenosis."  Dr. Sharon Kuong of Shields MRI noted "neuroforaminal narrowing at C3-C4 and C4-C5, which is unchanged."

In late June, 2008, Dr. Pavlovich examined Perry. He stated that Perry reported that the pain to his right shoulder had returned after a cortisone injection (that had significant positive results for approximately two months), but that he was unable to take any time off from his new job for surgery. He noted that Perry's right shoulder had a 5 out of 5 strength throughout all quadrants, and that it exhibited mildly positive impingement signs. He administered a cortisone shot but discussed possible surgical interventions. He stated that Perry also reported that his medial elbow pain had returned after he had visited the gym. He noted that Perry had a full range of motion, five out of five strength on grip (equal bilaterally), and full range of motion of the wrist, but that there was significant tenderness over the common flexor tendons and the medial condyles. Dr. Pavlovich performed a medial epicondylar injection.

In September, 2008, Dr. Dave Saroj conducted an outpatient physiatry initial evaluation of Perry. He stated that Perry rated his back pain an eight and his neck pain a six on a scale of one to ten. He stated that knee pain and elbow pain were also present but not severe. He stated that Perry had a full range of flexion and extension of his neck. He noted that Perry was able to stand and walk on his heels as well as his toes, though the heel walking was slightly difficult. He stated that Perry had

"chronic and back pain . . . with degenerative disc disease and arthritis with osteophyte at L4/L5 and C5/C6 with myofascial neck and back pain with mild spinal stenosis." He offered Perry physical therapy, but Perry declined because he had done several courses of physical therapy in the past. Dr. Saroj administered trigger point injections to treat Perry's lower back pain.

In February, 2009, Perry visited Caritas Norwood Hospital complaining of redness of the left arm due to sutures that were put there two days before when he was cut on window glass. Perry reported that he had a history of hepatitis C but had been treated and was completely cured, with "completely normal" liver tests. Perry was diagnosed with cellulitis, incised and drained, and advised that he should be admitted, but refused admission because he wanted to go see his daughter. He returned the next day, when it was found that the wound, although reddened, swollen, and somewhat painful, was healing well. Dr. Andrew Gellar suggested to Perry that he stay overnight, but he declined admission. Three days later, he returned and was given additional medication, but was discharged with conditions improved.

### 2. Medical Opinions

There are few comprehensive medical opinions in the record.

In April, 2009, Perry was found disabled by Disability Evaluation Services at the University of Massachusetts for the

purposes of the Emergency Aid to the Elderly, Disabled, and Children Program.  He submitted records from that determination to Social Security.  They included an August, 2007 evaluation by Dr. Allard.  Dr. Allard stated that Perry was disabled by chronic neck and back pain and depression.  She opined that he could stand and walk for less than thirty minutes, sit for thirty minutes, and could not lift, carry, stoop, or bend.  She further opined that his ability to understand, remember, concentrate, persist, and interact with co-workers and supervisors was decreased by his mental impairments.

In September, 2007, Dr. Allard completed a Medical Impairment Questionnaire.  She stated that Perry could stand for only about fifteen minutes and could walk less than a block.  She stated that he was unable to do light housework or significant shopping.  She stated that the medical basis for this opinion was his diagnoses of C3-4 disc protrusion, C4-5 foraminal stenosis and central canal stenosis, C6-7 disc protrusion touching the cord, L3-4 disc protrusion causing bilateral foraminal stenosis, L4-5 disc bulge touching the L4 nerve root, and L-5 disc bulge.

In September, 2007, an agency consultant, Dr. Swaran Goswami, completed a Physical Residual Functional Capacity Assessment based on his review of Perry's file.  His primary diagnosis was degenerative disc disease of the lower spine and lower back pain, and his secondary diagnosis was degenerative

disc disease of the cervical spine and neck pain.  He noted that other alleged impairments included hypertension, GERD, depression, hepatitis C, and osteoarthritis in the right shoulder.  Dr. Goswami concluded that Perry could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk with normal breaks for a total of two to three hours in an eight hour work day, sit with normal breaks for a total of about six hours in an eight hour workday, and push or pull, including operation of hand or foot controls, with limitations in the right shoulder.  He further concluded that Perry could only occasionally climb, balance, stoop, kneel, crouch, or crawl, had limitations in his ability to reach in all directions due to his right shoulder, and should avoid concentrated exposure to hazards such as machinery and heights.

Dr. Goswami noted that Perry had "no problems with personal care, makes simple meals, does light house work, walks, uses public transportation, shops in stores for food, watches TV, [and] goes to AA meetings."  He also included notes on Perry's automobile accident, on Dr. Allard's notes from August 2007, and on the shoulder x-rays taken in May 2007.

In October, 2007, Richard Stellar, Ed.D., P.C., completed a consultative examination report.  Dr. Stellar noted that Mr. Perry lived in a sober house and went to several group meetings a week as well as an AA or NA meeting every day.  He stated that

Perry watched television and saw his girlfriend, but that he largely "st[u]ck[] to himself." He noted that Perry reported that his sleeping was "not good" and that he napped for about an hour every day. Stellar stated that Perry went shopping with his girlfriend, prepared very simple meals, and often got help with his laundry because of his back problems. He noted that Perry was "in obvious pain," which was apparent from his gait, his difficulty sitting down and getting up, and his difficulty remaining sitting.

Dr. Stellar stated that Perry used to drink excessively and had used cocaine for about fifteen years, but that Perry reported he had been clean and sober for almost seventeen months. He stated that Perry had been concerned that he needed increasing amounts of Oxycontin and Percocet to deal with his pain and had stopped all pain medication while in prison.

Dr. Stellar stated that Perry had only been treated by his primary doctor with medication for mental health issues despite many years of depression and a more recent onset of anxiety, but that his doctor had talked to him about referring him to a mental health professional. He stated that Perry had been depressed since his accident but that his depression had increased with his father's death. Perry reported that his depression was a seven or an eight on a scale of one to ten, and that he had brief periods of feeling good but quickly got depressed again. Dr.

Stellar noted that Perry was not suicidal and did not experience hallucinations or delusions. He further stated that Perry had problems with anxiety which apparently began around the time that he was released from prison, and that Perry had anxiety attacks when his heart beat fast, his mind raced, he could not pay attention, and he felt overwhelmed.

Dr. Stellar found that Perry's "overall behavior and affect [were] within normal limits," that there was "no evidence of any psychotic thought process and no pressure of speech, flight of ideas, or tangential thinking," and that Perry, although he talked about a significant level of ongoing depression, did "not present as markedly depressed." He stated that Perry "appear[ed] mildly anxious," but that his description of his symptoms suggested a higher level of anxiety than apparent at the interview. He diagnosed Perry with dysthymic disorder, anxiety disorder, and mixed substance abuse in remission.

In October, 2007, state agency consultant Dr. Edwin Davidson completed a Psychiatric Review Technique form. He diagnosed Perry with dysthymic disorder, anxiety, and alcohol and prescription drug abuse in sustained remission. He found that Perry had mild restrictions on his activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, and pace.

Also in October, 2007, Dr. Davidson completed a Mental

Residual Functional Capacity Assessment.  He diagnosed Perry with depression, anxiety, and alcohol and prescription drug abuse in remission.  He found that Perry was moderately limited in his abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.

In May, 2008, Dr. Antonio Y. Medina, an orthopedic surgeon, completed a case analysis.  He reviewed the file, stating that the x-ray of Perry's cervical spine had shown mild changes at C5-6 with mild foraminal changes, that the x-ray of his lumbar spine showed some degenerative changes of the lateral view at L2-3 and L3-4, that the shoulder x-ray had shown degenerative changes at the AC joint, that the examination showed positive for impingement syndrome in Perry's right shoulder, and that the MRI of Perry's knee had shown a possible torn miniscus.  Dr. Medina opined that Perry's degenerative disc disease of the cervical and lumbar spine, impingement syndrome, and possible torn menisci were severe but did not meet a Listing under the social security regulations.

Dr. Medina also filled out a Medical Source Statement regarding Perry's ability to do physical work related activities. He stated that Perry could lift and carry up to ten pounds

frequently and up to twenty pounds occasionally. He stated that
Perry could sit, stand, or walk for two hours at a time without
interruption, and that he could sit, stand, or walk for a total
of six hours in an eight hour workday. He stated that Perry
could only occasionally reach overhead with his right or left
hand, but that he could frequently reach (other than overhead),
handle, finger, feel, and push/pull. He stated that Perry could
frequently climb stairs and ramps; occasionally balance, stoop,
kneel, crouch, or crawl; and never climb ladders or scaffolds.
He stated that Perry could never tolerate unprotected heights,
occasionally tolerate vibrations, and frequently tolerate moving
mechanical parts; operating a motor vehicle; humidity and
wetness; dust, odors, fumes, and pulmonary irritants; extreme
cold; or extreme heat. He opined that these limitations had
lasted or would last for more than a year.

### B. *Procedural History*

On May 3, 1999, Perry filed an application for SSI alleging
disability beginning August 13, 1998. The claim was denied
initially and on reconsideration, but was granted after a hearing
in July, 2000, in front of an Administrative Law Judge. The ALJ
found that Perry had "degenerative joint disease of the thoracic
and cervical spine with radiculopathy and low back pain," 40, and
that he did not have the residual functional capacity to perform
a substantial number of jobs in the economy. Although the ALJ

concluded that Perry was disabled, he noted that Perry's "condition [was] likely to improve" and so "recommended that th[e] case be medically reviewed in eighteen months." 44. Perry received SSI payments retroactive to the month that he filed the application.

In July, 2006, Perry was incarcerated at the Dedham House of Corrections in Dedham, Massachusetts. In August, 2006, Perry was notified that his SSI payments would stop effective July, 2006. The ALJ in the instant case observed that it appears Perry's SSI payments were suspended pursuant to 20 C.F.R. § 416.1325 (suspension due to residence in "public institution"), effective with the payment for July, 2006, and were terminated pursuant to 20 C.F.R. § 416.1335 (termination following 12 months of suspension) on or about July 1, 2007. Perry did not appeal the termination. In August, 2007, he was released from incarceration.

On August 6, 2007, Perry filed the application for SSI under consideration in the instant case, alleging disability beginning May 3, 1999. The claim was denied on November 2, 2007, and again on reconsideration on October 30, 2008. On May 20, 2009, after an administrative hearing, ALJ Stephen C. Fulton issued a decision finding Perry not disabled. The Decision Review Board selected the ALJ's decision for review, but did not complete its

review within ninety days, at the end of which the ALJ's decision became final.

On December 23, 2009, Perry filed an additional application for SSI alleging disability beginning May 3, 1999. On November 10, 2010, an ALJ issued a decision granting benefits effective the date of the application and finding Perry disabled as of that date.

### 1. Application and Appeals

In his application, Perry discussed his medical conditions and daily activities. He stated that he goes to meetings and visits family; prepares simple meals of frozen dinners, pasta, and sandwiches; goes food shopping once a week for over an hour; walks and uses public transportation; reads the bible and watches television. He stated that he has no problems handling his personal care. He stated that he is in constant pain, and that he can only walk ten to fifteen minutes, at which point he needs to rest for another ten minutes before he can resume walking. He stated that he takes Percocet and Oxycontin to relax his muscles and Atenol for his blood pressure (due to stress).

Perry's girlfriend, Lori Van Dam, completed a "function report" in which she stated that she helps Perry do chores and does errands with him, and that together they eat and watch television. She stated that he prays, watches tv, and goes to meetings daily. She stated that the pain prevents Perry from

sleeping, that he only prepares simple meals such as sandwiches or TV dinners, and that he does not do any household chores without help. She stated that he shops for personal items and for food, with help, once a week for a few hours. 162. She stated that he has no problems handling his personal care, and that he can walk for half a mile before needing to rest. She stated that he is constantly in pain and that she had observed his condition deteriorating over the past years.

Perry completed a form reporting that, as of April 23, 2009, he was taking the following medications: Prozac (for depression), Atenolol (for high blood pressure), Ultram (for pain), Norflex (for inflammation), ibuprofen (for pain), Protonix (for stomach acid), and Celemax (for arthritis). He reported that each of these medications was first prescribed to him in 2000.

### 2.  Hearing Testimony

The ALJ held a hearing on April 23, 2009. The claimant and vocational expert Joseph Goodman each testified.

### I.  Robert Perry

Perry testified that he was injured in an automobile accident in 1999, fracturing both elbows and more than one vertebra and experiencing paralysis from the neck down for two days. He stated that due to the accident he suffered migraine headaches, right shoulder pain, knee pain that was more severe in the left knee, and back pain from his neck down to his lower

back. He stated that the back pain had gotten worse since the accident due to arthritis, and that he especially felt the pain because he had not taken any Oxycontin or Percocet for it for the past three years. He stated that he regularly attended pain clinics and that he did physical therapy "every day when I can move." He said that he was seriously considering knee surgery.

Perry stated that he could stand or walk for no more than thirty minutes, and that he experienced discomfort after five or ten minutes of sitting. He stated that he napped twenty to thirty minutes a day and that he did not sleep well. He explained that he had been using a cane to assist in balancing since he fell through a window when his knees gave out. He stated that he prepared meals, visited his mother in the nursing home, and walked to the grocery store a quarter of a mile away for fresh air and exercise. He stated that his girlfriend helped with shopping and laundry, and that she took care of the light housework.

He stated that his transition from being an athlete to being disabled was depressing, and that he was very effected when his father died when he was in jail. He testified that he did not want to be around people sometimes, and that there were many days when he did not leave the house.

Perry testified that he had not worked for approximately eleven years. He stated that right before his incarceration, he

attempted to work as a superviser, but he could not stay on his feet for more than half an hour, and his "mind [wa]sn't into it." He testified that he wanted to work and he did not like the way things were.

ii. Joseph Goodman

Joseph Goodman, a vocational expert, considered a hypothetical individual of the claimant's age and education, with no relevant past work, who could perform work at the light exertion level with only occasional reaching with the right upper extremity; who should avoid climbing using a rope, ladder, or scaffold; who could only occasionally balance, stoop, kneel, crouch, or crawl; and who should avoid unprotected heights and only occasionally be exposed to vibrations. Goodman testified that such an individual would be able to perform the requirements of jobs (available in the following numbers (1) in Massachusetts and (2) nationally) such as: bench assembler (2,000 and 188,000); packing line worker (18,000 and 827,000); and surveillance system monitor (1,080 and 80,000).

3. <u>Decision of the ALJ</u>

The ALJ engaged in the standard five step evaluation process established by the Social Security Administration under the

authority of the Social Security Act. *See* 20 C.F.R.
§ 416.920(a).[1]

At step one, the ALJ determined that the claimant's work
after August 6, 2007, did not rise to the level of substantial
gainful activity.

At step two, the ALJ determined that Perry suffered from the
following severe impairments: osteoarthritis of the right
shoulder with possible small chip fracture of the distal
clavicle; left knee tear of posterior horn of the medial meniscus
and tear of the lateral meniscus; neck pain due to C3-4 small
disc bulge, C5-6 mild disc space narrowing and C6-7 protrusion;
and back pain due to mild L4-5 disc bulge.

The ALJ found that the claimant failed to submit persuasive
medical records demonstrating that his hepatitis C, GERD,
hypertension, medial epicondylitis of the left elbow, headaches,
status post laceration and cellulitis of the left arm, right knee

---

[1] The First Circuit has summarized the five steps: "1) if
the applicant is engaged in substantial gainful work activity,
the application is denied; 2) if the applicant does not have, or
has not had within the relevant time period, a severe impairment
or combination of impairments, the application is denied; 3) if
the impairment meets the conditions for one of the "listed"
impairments in the Social Security regulations, then the
application is granted; 4) if the applicant's "residual
functional capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5) if the
applicant, given his or her residual functional capacity,
education, work experience, and age, is unable to do any other
work, the application is granted." *Seavey v. Barnhart*, 276 F.3d
1, 5 (1st Cir. 2006).

problem, left shoulder problem, or depression significantly
limited his ability to perform basic work activities.  The ALJ
stated that such impairments were demonstrated only by the
claimant's own description of symptoms and not by observable
signs or laboratory findings.  He found that although Perry had
hepatitis C, his liver tests were normal; that although Perry
lacerated his left arm, there was no medical evidence of any
continued limitation; and that although Perry alleged other joint
pain, such pain was treated conservatively and did not require
surgery.

Regarding Perry's claim of depression, the ALJ found that it
was "situational" and "directly related to his father dying."
The ALJ stated that there was no evidence of psychosis or mania.
He stated that Perry's primary care physician prescribed
medication for depression but Perry never sought or received
psychiatric treatment.  He found that Perry could "perform a full
range of activities of daily living, which include maintaining
personal care, prepar[ing] meals, read[ing] the Bible and
visit[ing] his mother in the nursing home."  The ALJ stated that
he did not find State agency physician Richard Stellar's
assessment to be persuasive, given that the diagnoses and
assessment were based solely on Perry's own reports and a one-
time evaluation.

At step three, the ALJ found that Perry did not have an impairment or combination of impairments that met or was medically equivalent to the listed impairments in the regulations. He noted that "[n]o treating or examining physician has indicated findings that would satisfy the requirements of any listed impairment."

Before proceeding to step four of the evaluation process, the ALJ found that Perry had "the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except he can only occasionally reach with the upper right extremity." The ALJ found that Perry "should avoid climbing using a rope, ladder or scaffold;" that "[h]e can only occasionally balance, stoop, kneel, crouch or crawl;" and that "[h]e should avoid unprotected heights and only occasional[ly] be exposed to vibrations."

The ALJ stated that he found the claimant's pain symptoms to be "legitimate," 70, but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment . . . ." He found that treatment notes and testimony regarding the claimant's activities did not fully support his allegations regarding the limited range of his functional abilities and that the objective medical evidence did "not support the elevated level of impairment alleged."

The ALJ stated that he was "not persuaded by Dr. Allard's opinion, as it is conclusory in nature . . . and is not consistent with the claimant's treatment record." He did not assign her opinion controlling weight, but noted that he nonetheless considered her observations and findings. The ALJ did assign substantial weight to the opinions of the state agency physicians, stating that they were "not inconsistent with the medical evidence as a whole."

At step four, the ALJ concluded that Perry had no relevant past work.

Finally, at step five the ALJ concluded that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." He noted that the claimant was forty eight years old on the date that the application was filed but was now in the category of "closely approaching advanced age" and that the claimant had at least a high school education and could communicate in English. He relied on the testimony of a vocational expert that an individual of Perry's age, education, work experience, and residual functional capacity could perform the requirements of representative occupations such as bench assembler, packing line worker, and surveillance system monitor. The ALJ therefore concluded that a finding of "not disabled" was appropriate.

## II. STANDARD OF REVIEW

Under the Social Security Act, this court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Review is "limited to determining whether the ALJ used the proper standards and found facts based on the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

Although I review questions of law de novo, *Seavey v. Barnhart*, 276 F.3d at 9, the Commissioner's factual findings must be treated as conclusive if they are "supported by substantial evidence," 42 U.S.C. § 405(g). Substantial evidence exists where "a reasonable mind, reviewing the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." *Ortiz v. Sec'y of Health and Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (citation omitted). By contrast, I am not bound by factual findings that are "derived by ignoring evidence, misapplying law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

## III. ANALYSIS

Under the Social Security Act, an individual is "disabled" and therefore eligible for SSI benefits if the individual cannot

"engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382(c)(a)(3)(A). Perry argues that the ALJ should be reversed because (1) Perry was subsequently awarded benefits pursuant to a December, 2009, application; (2) the ALJ should have considered the evidence in Perry's prior file; (3) the ALJ incorrectly evaluated Dr. Allard's opinion; and (4) the ALJ made a factual error regarding nerve impingement.

## A.   *Subsequent Award of Benefits*

Perry contends that the allowance of benefits on November 10, 2010, subsequent to the ALJ's adverse decision in the instant case. should warrant a remand. This Court may "at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g). Perry argues that the November 10, 2010, decision is just such "new" and "material" evidence.

While the First Circuit has not addressed the issue, the Sixth Circuit has done so in a convincing manner. It held that "the mere existence of [a] subsequent decision in [the claimant's] favor, standing alone, cannot be evidence that can

26

chance the outcome of his prior proceeding." *Allen v. Comm'r*,

561 F.3d 646, 653 (6th Cir. 2009). The Sixth Circuit explained:

> If a subsequent favorable decision––separated from any new
> substantive evidence supporting the decision––could itself
> be "new evidence" under sentence six [of § 405(g)], the only
> way that it might change the outcome of the initial
> proceeding is by the power of its alternative analysis of
> the same evidence. But remand under sentence six is not
> meant to address the "correctness of the administrative
> determination" made on the evidence already before the
> initial ALJ.

*Id.* The mere fact that a second ALJ weighed the evidence

differently does not authorize reversal by a district court; the

standard is whether the first ALJ's decision was supported by

substantial evidence on the record, not whether it was the only

possible reasonable decision. 42 U.S.C. § 405(g). *See also*

*Seavey v. Barnhart*, 276 F.3d at 10 ("[T]he responsibility for

weighing conflicting evidence, where reasonable minds could

differ as to the outcome, falls on the Commissioner and his

designee, the ALJ. It does not fall on the reviewing court."

(internal citation omitted)).

The Sixth Circuit held that in some situations a subsequent

favorable decision could indicate cause for remand:

> A sentence six remand would be appropriate based on [the
> claimant's] subsequent favorable decision only if the
> subsequent decision was supported by new and material
> evidence that [the claimant] had good cause for not raising
> in the prior proceeding. It is [the claimant's] burden to
> make this showing under § 405(g) . . . .

*Allen*, 561 F.3d at 653. In *Allen*, because the claimant raised no

particular underlying piece of evidence, showing that it was both

new and material, the Sixth Circuit held that he had not carried his burden under § 405(g).

Here, similarly, Perry does not suggest any particular piece of evidence underlying the subsequent favorable decision he had good cause for not raising in the matter now before me. Although Perry includes the November 10, 2010, decision in his motion, he does not include any of the underlying evidence, and it is not possible to tell if the evidence discussed in the decision is cumulative, is based on the claimant's deteriorating state after the May, 2009, decision, or otherwise fails to meet the "new" and "material" requirements. The First Circuit has held that it is the claimant's burden to demonstrate that a piece of evidence is both new and material. *Evangelista v. Sec'y of HHS*, 826 F.2d 136, 139 (1st Cir. 1987) (Selya, J.). Perry has not carried this burden.

Perry raises two cases, *Luna v. Astrue*, 623 F.3d 1032 (9th Cir. 2010), and *Reichard v. Barnhart*, 285 F. Supp. 2d 728 (S.D.W.Va. 2003), in support of the proposition that a subsequent allowance of disability benefits may be "new" and "material" evidence warranting a remand under 42 U.S.C. § 405(g). These decisions are in the minority on this issue: as the Commissioner argues, a growing number of district courts have followed the Sixth Circuit's reasoning. *See, e.g, Johnson v. Astrue*, No. 3:09-2458-JMC-JRM, 2011 WL 902966 (D.S.C. March 15, 2011); *Jirau*

*v. Astrue*, 715 F. Supp. 2d. 814, 825-26 (N.D. Ill. 2010); *Mosley v. Astrue*, No. 09-CV-02005-LTB, 2010 WL 3777232, at *5 (D. Colo. Sept. 20, 2010); *Garcia v. Astrue*, No. 3:09-cv-26, 2010 WL 3769473, at *3 (D.N.D. Aug. 27, 2010), *adopted by* 2010 WL 3768462 (D.N.D. Sept. 17, 2010); *Brown v. Astrue*, No. CV-08-247-Cl, 2009 WL 2750726, at *8 (E.D. Wash. Aug. 25, 2009). Finding the Sixth Circuit's reasoning to be both persuasive and generally in accord with the First Circuit's interpretation of § 405(g). I hold that the November 10, 2010, decision, does not warrant reversal and remand as "new" and "material" evidence.

**B.    *Evidence in Perry's Prior File***

Perry next contends that the ALJ should have considered the evidence in the file that was the basis for his approval of benefits in 2000. He argues that his benefits were suspended and then terminated for reasons unrelated to medical improvement, and thus the evidence in his prior application is relevant to his current claim. He argues that although the ALJ wrote that he had considered all of the medical information in the file, the file was incomplete because it did not contain the documents and evidence from the prior application and hearing. He contends that this is a sufficient basis for remand.

The Second Circuit considered a similar argument in *DeChirico v. Callahan*, 134 F.3d 1177 (2d Cir. 1998). Counsel for the claimant in that case had gone a step further than Perry's

counsel and requested that the ALJ subpoena his client's prior
file, stating that he believed it included material that would be
helpful in evaluating the new application.  The ALJ did not issue
the subpoena, and the Second Circuit nonetheless affirmed the
denial of benefits, noting that "because DeChirico *was*
represented by counsel, because the fact of his impairment was
not in dispute, and because counsel offered no other reasons that
the ten-year old file might be relevant, we cannot say that the
ALJ abused his discretion in failing to subpoena it on his own
initiative." *DeChirico*, 134 F.3d at 1183.  The First Circuit
has similarly expressed that "[w]hen a claimant is represented,
the ALJ should ordinarily be entitled to rely on claimant's
counsel to structure and present the claimant's case in a way
that claimant's claims are adequately explored." *Faria v.
Comm'r*, 187 F.3d 621 (Table), 1998 WL 1085810, at *1 (1st Cir.
Oct. 2, 1998) (per curiam).  Here, Perry was represented by
counsel, and counsel failed even to request that the file be
subpoenaed or to state that records in it might be relevant.  The
ALJ was entitled to rely on Perry's counsel to present claimant's
case and raise the issue.[2]  *See Boutsianis v. Astrue*, 2008 WL

---

[2]  Perry cites *Brennan v. Astrue*, 501 F.Supp.2d 1303 (D.
Kan. 2007), for the proposition that the failure to consider
medical files from a previous application is grounds for
reversal.  *Brennan*, however, is inapposite.  In *Brennan*, the
claimant's counsel included older medical records in the file and
the ALJ did not present those records to the medical expert.
Here, by contrast, Perry's counsel never subpoenaed the records

899361, at *9 n.3 (D.N.H. April 1, 2008) (rejecting the argument that the ALJ failed to develop the record by failing to request a treating physician's notes where the claimant "was represented by counsel throughout these proceedings but never presented these records to the ALJ, never informed the ALJ or the Appeals Counsel that these records existed or were required, and never requested that the ALJ subpoena these records.")

Moreover, while Perry vaguely suggests that perusal of the previous file would have made a difference, he fails to advance any particularized argument that he was prejudiced.  Although Perry argues that arthritis and degenerative joint disease are progressive conditions that do not improve with time, Perry's disability related to his accident, and the ALJ in the previous case wrote that Perry's "condition [was] likely to improve, as noted by the expert" and "recommended that th[e] case be medically reviewed in eighteen months."  The fact of Perry's impairment was not in dispute, and the previous ALJ's statement makes it unlikely that the earlier medical records would fully relate to Perry's current residual functional capacity or that the failure to consider those records prejudiced the claimant.

The First Circuit held in *Faria* that where the claimant was represented by counsel, "[w]e will not fault the ALJ for failing to secure [a doctor's] treatment notes or ask further questions,

_____

or otherwise presented them for review.

particularly where claimant has not shown how he was prejudiced by the ALJ's alleged shortcomings." *Faria*, 1998 WL 1085810, at *1. Here, where Perry was represented by counsel, I will follow the First Circuit approach and will not fault the ALJ for failing to secure the previous application or ask further questions, particularly where Perry has not shown how he was prejudiced by the ALJ's failure to *sua sponte* subpoena the file.

## C. *Dr. Allard's Opinion*

Perry contends that the ALJ failed to assign adequate weight to Dr. Allard's medical opinion. The ALJ wrote that Dr. Allard's opinion was conclusory in nature and was inconsistent with Perry's treatment record. He further noted that her evaluations were completed in August and September, 2007; that she had examined the claimant on six occasions between September, 2007, and September, 2008, most recently seven months before his decision; and that she had not provided an updated assessment of the claimant's conditions. He concluded that he was "not persuaded by Dr. Allard's opinion," and that he did not assign it controlling weight, although her "observations and findings [were] not ignored and [were] carefully considered in providing insight as to functional ability and how they affect the claimant's ability to work."

In discussing the weight that will be given to the opinions of "treating sources," the regulations provide:

> Generally, we give more weight to opinions from [the
> claimant's] treating sources, since these sources are likely
> to be the medical professionals most able to provide a
> detailed, longitudinal picture of [the claimant's] medical
> impairment(s) . . . . If we find that a treating source's
> opinion on the issue(s) of the nature and severity of [the
> claimant's] impairment(s) is well-supported by medically
> acceptable clinical and laboratory diagnostic techniques and
> is not inconsistent with the other substantive evidence in
> your case record, we will give it controlling weight.

20 C.F.R. § 416.927. In order to deny the opinion of a treating

source controlling weight, "the evidence that is inconsistent

with the opinion need not prove by a preponderance that the

opinion is wrong. It need only be such relevant evidence as a

reasonable mind would accept as adequate to support a conclusion

that is contrary to the conclusion expressed in the medical

opinion." SSR 96-2p.

Here, substantial evidence exists to support the ALJ's

decision not to assign controlling weight to Dr. Allard's

opinion. The ALJ credited the opinions of the state agency

physicians. Perry contends that the lack of examination by the

state agency doctors, together with the lack of a complete

medical record review including the earlier file, rendered their

opinions insubstantial. However, the ALJ did not rely on these

opinions alone, but instead found that they, unlike Dr. Allard's

opinion, were consistent with the medical evidence as a whole.

In December, 2007, Dr. Allard noted that Perry had just

started working part-time as a roofing supervisor. In January,

2008, Dr. Doyle stated that Perry complained of "mild

arthralgias" and noted that Perry had been "working out" and "appear[ed] to be in good physical condition."  He stated that Perry was "a well-developed, well-nourished male in no acute distress."  Dr. Pavlovich's records from June, 2008, state that Perry reported that he was unable to take off any time from his job for surgery.  He also rated Perry's right shoulder strength a five out of five, and noted that it exhibited only mildly positive impingement signs.  Dr. Saroj wrote in September, 2008, that Perry had a full range of flexion and extension of his neck. Notably, all of these records were based on examinations of Perry conducted after Dr. Allard's medical opinions were submitted.

A reasonable factfinder could conclude that Dr. Allard's medical opinion was contrary to the record as a whole. Substantial evidence exists to support a less constricted view of Perry's limitations, such as that taken by the state agency physicians.

**D.   *Nerve Impingement***

Perry additionally argues that the ALJ stated that there was no objective evidence of nerve impingement, but that this was incorrect because the March 17, 2008, MRI showed flattening of the ventral cervical spinal cord, and nowhere did any clinician discredit Perry's assertions of pain.

The ALJ made the statement that there was "no evidence of spinal cord or nerve root impingement" in the context of

evaluating whether Perry had an impairment meeting the requirements of Listing 1.04. The regulations state that for an impairment of the spine resulting in compromise of a nerve root to meet the requirements of the Listing, there must be "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." 20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ appears to have stated that there "no evidence of . . . nerve root impingement" within the context of this more detailed definition of nerve root impingement supplied by the regulations, and not in order to imply a broader, colloquial interpretation of the phrase. Perry does not contend that he *does* meet the Listing. Moreover, Dr. Medina did observe that Perry suffered from impingement syndrome, but concluded that nonetheless Perry's impairment did not meet the requirements of the Listing.

To the extent that Perry might contend that the ALJ wrongly found that there was no evidence of impingement, where such a finding is broadly construed (instead of meaning Listing-level impingement), any error was harmless. The ALJ credited Dr. Medina's opinion, in which Medina found that Perry suffered from impingement syndrome. The ALJ used that opinion as the basis for

his assessment of Perry's residual functional capacity--in fact, the ALJ's assessment was identical to Dr. Medina's. Thus, Perry does not show that the failure to find that Perry suffered from impingement syndrome affected the ALJ's assessment of Perry's residual functional capacity or his step five determination.

## IV. CONCLUSION

For the reasons set forth more fully above, I GRANT the Commissioner's motion to affirm (Dkt. No. 16) and DENY the claimant's motion for an order reversing that decision (Dkt. No. 13).


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE